UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON


UNITED STATES OF AMERICA,

       Respondent

v.                                    CRIMINAL NO. 2:99-00170-01


SHANE COWLEY,

       Movant


MEMORANDUM OPINION AND ORDER


       Pending is the movant's motion pursuant to the Innocence Protection Act of 2004, 18 U.S.C. § 3600, for DNA Testing ("motion for DNA testing"), filed June 6, 2014.

       The factual recitation that follows in section I.A is taken substantially from the May 23, 2003, proposed findings and recommendation entered by the magistrate judge respecting an April 1, 2002, motion movant filed pursuant to 28 U.S.C. § 2255. In its order adopting the proposed findings and recommendation, and which denied the relief sought, the court noted that the magistrate judge's submission included "a careful recitation of the procedural posture and factual development of" the criminal case.  (Ord. at 3).

I.

A.   Prior Proceedings

On September 8, 1999, Mr.  Cowley was named in a four-count indictment charging him with (1) receipt of a stolen firearm, (2) attempted possession with intent to distribute methamphetamine, (3) the use and carrying of a firearm in relation to a drug trafficking crime, and (4) tampering with a witness.

The first three charges arose out of a single incident: the July 30, 1998, attempted robbery and murder of an alleged drug dealer, Jeff Stone, also known as "Fat Boy" (hereinafter "Stone" or "Fat Boy").  The fourth charge, tampering with a witness, stemmed from alleged threats made by Mr. Cowley to Paul Vance.

Trial commenced in January 2000.  Mr. Cowley's sister had an improper communication with a juror, resulting in a mistrial.  The retrial commenced in March 2000, culminating in Mr. Cowley's conviction on all four counts.  During each trial, Mr. Cowley was represented by counsel, Michael Cline.

2

On August 17, 2000, he was sentenced to 45 years imprisonment, consisting of 10 years for possession of a stolen firearm (Count 1), 20 years for the attempted possession with intent to distribute (Count 2), 5 years for the use and carrying of a firearm in relation to a drug trafficking crime (Count 3), and 10 years for witness tampering (Count 4).

Mr. Cowley noticed a direct appeal, which was unsuccessful.  As noted, on April 1, 2002, he unsuccessfully moved for relief pursuant to 28 U.S.C. § 2255.  So too was his appeal that followed.

The evidence at trial focused on Mr. Cowley's conduct and whereabouts on July 29 and 30, 1998.  At approximately 12:50 a.m. on July 30, 1998, Stone was murdered outside his trailer on Clover Hollow Road, near Campbells Creek in Kanawha County.  His twelve-year-old son witnessed the shooting.  He testified at trial about the two masked perpetrators who met the general physical description of Mr. Cowley and his friend, Ron Moore, also known as "Strohs."  He also described the guns that were used.

Numerous friends and acquaintances of Mr. Cowley testified for the United States.  Many of them were convicted

3

drug offenders.  They agreed to testify as a part of their plea agreements.  The evidence showed that prior to Stone's murder Mr. Cowley, an admitted drug user, talked about and planned to rob Stone for drugs and money.

For example, Beverly Oldham, a friend of Stone, testified that Mr. Cowley asked her to let him hide under a motel room bed that Oldham and Stone were sharing so that he could rob Stone.  She further testified that she had seen Mr. Cowley with a gun matching the description of one used during the murder.  Two other witnesses, Paul Vance and John Hudson, Sr., partially corroborated Oldham's account.  They said that, within a month or two of Stone's murder, they heard Mr. Cowley speak about robbing Stone.

The United States' proof also showed that, on the night of the Stone murder, Mr. Cowley got a stolen firearm from Elizabeth (Chris) Martin prior to Stone's murder.  It matched the general description of one of the guns seen by Stone's son.

In meeting the United States' evidence, Mr. Cowley offered an alibi.  He claimed that he and Mr. Moore were at Chris Martin's house in Belle, West Virginia, approximately 20 minutes before the murder.  He said they stole a truck from a

4

residence in Malden, West Virginia, later that evening, which is approximately one mile from the murder scene.  The United States did not dispute that they stole the truck.  It instead offered rebuttal that they could have stolen the truck and still murdered Stone in the time frame presented.

During the course of the section 2255 proceedings, the magistrate judge conducted an evidentiary hearing respecting Mr. Cowley's allegations of ineffective assistance.  The material portion of the magistrate judge's findings of fact are summarized as follows:

1.  Mr. Cowley's lawyer hired investigator Michael Mounts.

2.  During Mr. Cowley's prosecution, he was approached at the South Central Regional Jail ("SCRJ") by Overton Wayne Pauley, who told him he knew about Stone's murder. Pauley said he was present when Stone was killed.  He claimed that Nort Hudson, Jason Vickers, and Suwin Satsuray, also known as "Jazz," were involved.

3.  Pauley discussed his allegations with others, including Clarence Woolfolk, Chris Atkins, Carl Matheny, Ron Koerner and Jimmy McDaniel, who were fellow inmates at SCRJ.

4.  Following Mr. Cowley's first trial, Pauley drew a diagram of a gun that was supposedly used in Stone's murder. Pauley gave it to a correctional officer, who supplied it to Mr. Mounts.  Mr. Mounts told Mr. Cowley the drawing resembled witness accounts at the first trial.

5.  Mr. Pauley's spouse Tammy told Mr. Cowley that her husband, Nort Hudson, Satsuray, and Jason Vickers returned to Nort's house on the night of the murder.  She

said she overheard them talking about it.  They later
assembled together to dispose of weapons and ammunition.
Mr. Mounts met with her and prepared a memo summarizing
her statements, which Mr. Cline had prior to the second
trial.

6.    The Assistant United States Attorney who prosecuted Mr.
Cowley observed that Satsuray is not a United States
citizen and can speak a foreign language.

7.    Mr. Cowley understood that his defense team's
investigation revealed that Pauley and Nort's crew robbed
drug dealers and at least one of them occasionally spoke
in a foreign language.  Mr. Cowley understood that when
Pauley participated in a robbery of a Mr. Facemyer, one
of his confederates spoke in a foreign language much like
Spanish.  Mr. Cowley discussed these facts with his
lawyer and Mr. Mounts.

8.    Stone's son testified, and recounted during two
investigative interviews, that one of the perpetrators
spoke a foreign language.

9.    Christopher Scott Atkins and James McDaniel knew Pauley
and were incarcerated at SCRJ with Pauley and Mr. Cowley.
Pauley told Atkins that Nort killed Stone.  Pauley told
McDaniel that he was present when Nort shot Stone.
Neither Mr. Cowley's lawyer nor Mr. Mounts ever talked to
Atkins or McDaniel about the allegations.

10.   Oldham testified at trial that, a few weeks prior to the
murder, she had seen Mr. Cowley carrying a gun similar to
that described by Mr. Stone's son as the murder weapon
used to murder his father.

11.   Betty Harper, Ms. Oldham's mother, had a conversation
with her daughter concerning her daughter's testimony at
the first trial.  Her daughter was very upset, stating
she had talked to the prosecution, that they had gone
over her testimony with her and shown her a diagram of
the gun, and how to describe it.  Ms. Harper asked her
"Was that the gun that you saw Shane with," to which Ms.
Oldham responded it was not that gun, but that she was
upset that she might lose her two children if she did not

go along with the United States. Ms. Harper communicated
this to Mr. Cowley's mother, Linda McKeny, who
communicated it to the court by letter.  Neither Mr.
Cline nor Mr. Mounts, ever discussed the matter with her
but Mr. Cowley mentioned it to Mr. Mounts.

B.    The Instant Motion Pursuant to 18 U.S.C. § 3600(a)

Mr. Cowley moves pursuant to 18 U.S.C. § 3600(a) for
an order authorizing his counsel to inspect all physical
evidence being held by the State of West Virginia, in the
possession of the Kanawha County Sheriff's Department, relating
to the Stone murder.  He also seeks any remaining evidence held
by the United States and presented at trial.  He asserts the
inspection would permit him to determine the presence of
biological evidence, which could then be subjected to DNA
testing at the Federal Bureau of Investigation crime laboratory.

Mr. Cowley asserts that he is actually innocent of the
crimes with which he is charged, which he asserted as well
during trial.  He contends that the proposed DNA testing would
produce new material evidence that would demonstrate he was not
involved in the crimes of conviction and would raise a
reasonable probability that other perpetrators, unlike him, were
present at the Stone murder.

7

Mr. Cowley sets forth the following additional
information found in affidavits attached to his motion:

**KEARY DRAKE AVERS AS FOLLOWS:**

He lied during trial to avoid a conspiracy
prosecution.

Mr. Cowley's trip to Florida shortly after the murder
of Stone was to pursue a legitimate job opportunity
and not to evade arrest.

He passed a lie detector test administered prior to
trial by the United States concerning his allegation
that Mr. Cowley was actually innocent of the Stone
charges.

**JAMES McDANIEL, JR., AVERS AS FOLLOWS:**

He avers that Mr. Cowley never admitted that he had
committed the offenses of which he was convicted.

**RONNIE MOORE AVERS AS FOLLOWS:**

He and Mr. Cowley were at another location stealing a
truck when the Stone murder occurred.

Mr. Cowley told Shawn Pittman in a sarcastic and
joking manner that he had killed Stone when he had not
done so.

Contrary to the trial testimony of Paul McDonough, two
sheriff deputies told Moore that they had a video
showing Moore and Mr. Cowley at a Go-Mart the night of
the Stone murder.

**JAMES FACEMEYER AVERS AS FOLLOWS:**

Nort Hudson, Satsuary, Robert Parsons, Shawn Pittman,
and Pauley robbed him in May 1998 in almost identical
fashion to the Stone robbery and murder in July 1998.

8

**TAMMY VIA-PAULEY AVERS AS FOLLOWS:**

Pauley confessed to her on two occasions he was the driver in the Stone robbery and murder, with the crime being committed by Hudson, Satsuary, and Parsons, in a manner consistent with the Facemeyer robbery.

Pauley also admitted to her in detail how he, Hudson, Satsuary, and Parsons stopped at a garage to collect a debt for Hudson, the circumstances surrounding which Mr. Cowley believes to contradict the trial testimony of Darrell Spurlock.


**WANDA PITTMAN AVERS AS FOLLOWS:**

Pauley admitted to her by telephone on another occasion that he was the driver during the Stone robbery and murder and that the confederates were Hudson, Satsuary, and "another dude" not identified as Mr. Cowley.


**SUZANNE McCOMAS AVERS AS FOLLOWS:**

Ms. McComas, a private investigator employed by Mr. Cowley, began investigating this matter in January 2014. She did not locate any record of either Pauley's or Hudson's fingerprints being submitted for comparison in the crime.

Ms. McComas identified Marvin Garrett, who did not testify at trial, as another individual to whom Mr. Hudson confessed concerning the killing of Stone.


**MICHAEL MOUNTS AVERS AS FOLLOWS:**

He verified Mr. Cowley's claim that he had stolen a car the night of the Stone murder.

Mr. Moore was prepared to testify that Mr. Cowley was with him the night of the Stone murder but instead invoked his Fifth Amendment privilege.

Pauley drew a picture of a gun that Hudson used to murder Stone.

No video of Mr. Cowley and Mr. Moore at the Go-Mart on the night of the Stone murder was ever produced to the defense team.

The defense was unaware of any DNA testing of the evidence presented at Mr. Cowley's trial or of the physical evidence in the Stone homicide that is in the possession of the State of West Virginia.

The United States offers a number of reasons that the motion should be denied.  It asserts that the motion (1) is untimely, (2) does not identify the specific objects for testing, and (3) fails to demonstrate how the testing of these objects would show Mr. Cowley's actual innocence.[1]

III.

A.   Governing Standards

One court of appeals notes that "the issue of post-conviction DNA testing has in recent years captured the

---

[1] The United States also points out that Mr. Cowley has not agreed to submit his DNA to the National DNA Index System ("NDIS").  Inasmuch as Mr. Cowley, in his reply, certifies his willingness to do so to the extent samples were previously collected from him by the Bureau of Prisons, the court need not address the matter.

attention of the Congress and the legislatures of nearly every state in the nation." McKithen v. Brown, 481 F.3d 89, 91 (2nd Cir. 2007).  The Innocence Protection Act of 2004, codified at 18 U.S.C. § 3600, "allows federal prisoners to move for court-ordered DNA testing under certain specified conditions." See District Attorney's Office for Third Judicial Dist. v. Osborne, 557 U.S. 52, 62-63 (2009).  Section 3600 provides materially as follows:

> (a) In general.--Upon a written motion by an individual under a sentence of imprisonment or death pursuant to a conviction for a Federal offense (referred to in this section as the "applicant"), the court that entered the judgment of conviction shall order DNA testing of specific evidence if the court finds that all of the following apply:
>
>   (1) The applicant asserts, under penalty of perjury, that the applicant is actually innocent of--
>
>     (A) the Federal offense for which the applicant is under a sentence of imprisonment or death;
>
>           . . . .
>
>     (2) The specific evidence to be tested was secured in relation to the investigation or prosecution of the Federal . . . offense referenced in the applicant's assertion under paragraph (1).
>
>     (3) The specific evidence to be tested--
>
>       (A) was not previously subjected to DNA testing and the applicant did not--

(i) knowingly and voluntarily waive the
right to request DNA testing of that
evidence in a court proceeding after the
date of enactment of the Innocence
Protection Act of 2004; or

(ii) knowingly fail to request DNA testing
of that evidence in a prior motion for
postconviction DNA testing;

. . . .

(4) The specific evidence to be tested is in the
possession of the Government and has been subject
to a chain of custody and retained under
conditions sufficient to ensure that such evidence
has not been substituted, contaminated, tampered
with, replaced, or altered in any respect material
to the proposed DNA testing.

(5) The proposed DNA testing is reasonable in
scope, uses scientifically sound methods, and is
consistent with accepted forensic practices.

(6) The applicant identifies a theory of defense
that--

  (A) is not inconsistent with an affirmative
  defense presented at trial; and

  (B) would establish the actual innocence of
  the applicant of the Federal . . . offense
  referenced in the applicant's assertion under
  paragraph (1).

(7) If the applicant was convicted following a
trial, the identity of the perpetrator was at
issue in the trial.

(8) The proposed DNA testing of the specific
evidence may produce new material evidence that
would--

(A) support the theory of defense referenced
in paragraph (6); and

(B) raise a reasonable probability that the
applicant did not commit the offense.

(9) The applicant certifies that the applicant
will provide a DNA sample for purposes of
comparison.

(10) The motion is made in a timely fashion,
subject to the following conditions:

(A) There shall be a rebuttable presumption of
timeliness if the motion is made within 60
months of enactment of the Justice For All Act
of 2004 or within 36 months of conviction,
whichever comes later. Such presumption may be
rebutted upon a showing--

(i) that the applicant's motion for a DNA
test is based solely upon information used
in a previously denied motion; or

(ii) of clear and convincing evidence that
the applicant's filing is done solely to
cause delay or harass.

(B) There shall be a rebuttable presumption
against timeliness for any motion not
satisfying subparagraph (A) above. Such
presumption may be rebutted upon the court's
finding--

(i) that the applicant was or is
incompetent and such incompetence
substantially contributed to the delay in
the applicant's motion for a DNA test;

(ii) the evidence to be tested is newly
discovered DNA evidence;

(iii) that the applicant's motion is not
based solely upon the applicant's own

> assertion of innocence and, after
> considering all relevant facts and
> circumstances surrounding the motion, a
> denial would result in a manifest
> injustice; or
>
> (iv) upon good cause shown.
>
> (C) For purposes of this paragraph--
>
> (i) the term "incompetence" has the
> meaning as defined in section 4241 of
> title 18, United States Code;
>
> (ii) the term "manifest" means that which
> is unmistakable, clear, plain, or
> indisputable and requires that the
> opposite conclusion be clearly evident.

18 U.S.C. § 3006.

The "court ordered testing of DNA [requires] an applicant . . . satisfy each of the ten prerequisites enumerated in the statute." United States v. Fields, 761 F.3d 443, 481 (5th Cir. 2014) (quoting United States v. Fasano, 577 F.3d 572, 575 (5th Cir. 2009). The United States Court of Appeals for the Second Circuit has articulated the statutory prerequisites as follows, leaving aside discussion of the timeliness requirement:

> To warrant post-conviction DNA testing, as
> applicable here, the court that entered the judgment
> of conviction must find the following: (1) that the
> applicant seeking testing has submitted a written
> motion setting forth, under penalty of perjury, that
> he is "actually innocent" of the federal offense for
> which he is serving a sentence of imprisonment; (2)
> that "[t]he specific evidence to be tested was secured

14

in relation to the investigation or prosecution of the
Federal . . . offense" for which the applicant is
serving his sentence; (3) the evidence was not
previously subjected to DNA testing, the applicant did
not waive his right to request DNA testing of such
evidence in a court proceeding after the date of
enactment of the Innocence Protection Act, and he did
not fail to request testing of that evidence in a
prior postconviction motion for DNA testing; (4) that
the evidence to be tested is in the government's
possession, has been subject to a chain of custody,
and has been retained under conditions that ensure the
evidence has not been tainted in any manner material
to DNA testing; and (5) that the "proposed DNA testing
is reasonable in scope, uses scientifically sound
methods, and is consistent with accepted forensic
practices."

The court must make further findings that (6) the
applicant identifies a defense theory "not
inconsistent with an affirmative defense presented at
trial" and that would establish "actual innocence" of
the offense of conviction; (7) in the case of one
convicted after trial, . . . the perpetrator's
identity was at issue; (8) the proposed testing "may
produce new material evidence" supporting the defense
theory identified and "raise a reasonable probability
that the applicant did not commit the offense"; and
(9) the applicant certifies that he will provide a DNA
sample for comparison purposes.

<u>United States v. Pitera</u>, 675 F.3d 122, 127-28 (2nd Cir. 2012).

B.   Analysis

In his opening brief, Mr. Cowley asserts as follows on

the central issue of timeliness: "This motion is timely in that

. . . , after considering all relevant facts and circumstances

15

surrounding the motion, a denial would result in a manifest injustice." (Mot. at 3). In response to that succinct assertion, the United States launched a full frontal assault on whether Mr. Cowley has acted seasonably.

In reply, Mr. Cowley asserts that he has shown manifest injustice or good cause sufficient to rebut the presumption of untimeliness found in section 3600. He notes that his investigator, Suzanne McComas, did not know him prior to October 2013 and did not commence her investigation in this matter until January 2014. During that investigation, insofar as new evidence is concerned, she is said to have, inter alia, (1) independently found an additional witness placing Nort at the scene of the robbery and murder of Mr. Stone, (2) learned that Keary Drake now admits he lied on the stand in exchange for a promise of leniency, (3) located Wanda Pittman, who asserts that Pauley admitted to her by telephone that he and his confederates were present at the Stone robbery and murder and not Mr. Cowley, and (4) learned that James Facemeyer contends that he was victimized by Nort, Satsuray, and others, in a similar manner to that experienced by Stone and shortly before the Stone murder.

What is missing from Mr. Cowley's showing is an explanation concerning why so many years passed before he sought the assistance of Ms. McComas in developing the asserted new evidence.  In relying upon his ability to putatively show a manifest injustice if his motion is not deemed timely, it is incumbent upon Mr. Cowley to demonstrate, as the statute requires, that the injustice would be "unmistakable, clear, plain, or indisputable and requir[ing] that the opposite conclusion be clearly evident."  18 U.S.C. § 3600(a)(10)(C)(ii). A showing in accordance with this standard requires more than simply demonstrating that a failure to entertain the motion may leave an innocent behind bars.  See United States. v. MacDonald, --- F.Supp.2d ---, ---, 2014 WL 3895937, at *9-10 (E.D.N.C. Aug. 8, 2014) ("Presumably any applicant who has untimely filed a motion under the IPA, along with some other evidence other than his own assertion of innocence, would argue the same thing -- that the denial of the motion results in his loss of opportunity to prove his innocence conclusively. If that is all that is required to rebut the presumption of untimeliness, however, then the presumption is meaningless.").

The timeline in this matter certainly requires an explanation.  On September 8, 1999, Mr. Cowley was indicted.  On

17

August 17, 2000, he was sentenced.  His direct appeal efforts concluded unsuccessfully on April 30, 2001.  His motion pursuant to section 2255 was denied on March 20, 2006, and the appellate proceedings thereon concluded on June 21, 2006, nearly two years after the enactment of the Innocence Protection Act of 2004.

Mr. Cowley then waited almost eight (8) years to the day to seek relief under the Innocence Protection Act.  This unexplained and protracted delay is a salient fact in considering, as the statute requires on the subject of timeliness, "all relevant facts and circumstances surrounding the motion."  18 U.S.C. § 3600(a)(10)(B)(iii).  In light of this delay, and the absence of any explanation concerning why it occurred, Mr. Cowley is unable to show that a manifest injustice would result if the motion is denied on timeliness grounds.  That is especially the case when he has made a minimal showing, at best, that the evidence sought to be tested, which was not even identified with specificity until the reply brief, would be expected to harbor DNA evidence.

It is, accordingly, ORDERED that Mr. Cowley's motion for DNA testing be, and hereby is, denied.

18

The Clerk is directed to forward copies of this written opinion and order to the movant and all counsel of record.

DATED: December 31, 2014

John T. Copenhaver, Jr.
United States District Judge